

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

July 2, 2025

<u>By ECF</u>
The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

    **Re:**    ***United States v. Malik Tyson*, S1 24 Cr. 252 (VEC)**

Dear Judge Caproni:

    The Government respectfully submits this letter in advance of the sentencing of Malik Tyson ("Tyson" or the "defendant") in the above-referenced matter, which is scheduled for July 17, 2025. On January 30, 2025, the defendant pled guilty pursuant to a plea agreement with the Government (the "Plea Agreement"), to one count of conspiracy to defraud the United States, in connection with the defendant's acting as a straw purchaser and transporting guns in connection with an interstate gun trafficking conspiracy. In the Plea Agreement, the parties agreed to a Stipulated Guidelines Sentence of 60 months' imprisonment. However, and as set forth below, based on information provided by the Government, the United States Probation Office subsequently calculated a Guidelines range of 37 to 46 months' imprisonment. For the reasons set forth below, the Government respectfully submits that a significant custodial sentence of at least 37 months' imprisonment is sufficient, but not greater than necessary, to serve the purpose of sentencing.

## I.    Factual Background

    As described in the Final Presentence Investigation Report, dated May 7, 2025 ("PSR"), between approximately April 2022 and October 2023, the defendant and his co-conspirator Damian Diaz conspired to purchase, transport, and sell firearms between Tennessee and New York. PSR ¶ 12. The defendant, who previously resided in Tennessee, bought at least 17 firearms in Tennessee, transported them to the Southern District of New York, and then sold them to Diaz. PSR ¶ 12. Five of the firearms transported by the defendant were recovered by law enforcement in the Southern District of New York.[1] PSR ¶ 12. At least two had been used in shootings. PSR ¶ 12. The "time to crime" in the Southern District of New York for one of those firearms— meaning, the time that lapsed between Tyson's purchase of a firearm, and the firearm's recovery

---

[1] The PSR notes that as of May 7, 2025, four firearms had been recovered. PSR ¶ 12. After the PSR was finalized, the Government became aware that a fifth firearm was recovered by the New York Police Department ("NYPD") on May 17, 2025, in the Bronx, New York.

after a shooting—was only 36 days. PSR ¶ 12. The firearms purchased by Tyson included a number of handguns and pistols, as well as at least one shotgun.

The defendant traveled from Tennessee to New York at least four times between approximately April 2022 and October 2023. PSR ¶ 13. Each of those trips took place shortly after the defendant had purchased additional firearms for use in the conspiracy. For example, on May 18, 2023, the defendant purchased a Ruger LCP .380 caliber pistol from a firearms dealer in Tennessee. PSR ¶ 13. A week later, the defendant booked a bus ticket to New York. PSR ¶ 13. On June 23, 2023, the Ruger the defendant purchased was recovered by the NYPD. PSR ¶ 13.

The defendant and Diaz communicated extensively about the purchase and sale of guns via text message. These text messages concerned firearms purchases, prices, availability, and coordination of in-person meetings to exchange the firearms. PSR ¶ 14. The two discussed the type and quantity of firearms the defendant should buy and when he should travel to New York. PSR ¶ 14. In a message dated August 2023, the two discussed someone else who was preparing to send money to the defendant for the purchase of a firearm. PSR ¶ 14. Diaz wrote that he was "naked out there," and the defendant replied, "[a]lready knowin . . . shit be wild, im get sum to the area soon." PSR ¶ 14. In context, Diaz was expressing that he did not have any firearms (*"naked out there"*) and, in response, the defendant conveyed that he would fix that soon and transport some firearms to New York for Diaz (*"im get sum to the area soon"*).

Diaz's text messages also include discussions around payments that Diaz appears to have directed third parties to make for the financing and purchase of firearms by the defendant. PSR ¶ 15. In one such exchange, the defendant provided his CashApp account to Diaz and asked the defendant to confirm whether Diaz would send funds for "the other 9m," *i.e.*, a 9-millimeter firearm. PSR ¶ 15. A review of the defendant's CashApp records shows that on at least one occasion, the defendant received payments that appeared to have been made on Diaz's behalf, and that coincide with the timing of the firearms purchases made by the defendant. PSR ¶ 15.

The text messages between the defendant and Diaz also include references to the Diaz's trafficking of marijuana. PSR ¶ 16. One exchange refers to the defendant's simultaneous purchase or receipt of marijuana from the defendant during a firearms sale. PSR ¶ 16.

## II.    The Plea and Guidelines Calculation

On April 24, 2024, a grand jury sitting in this District returned a two count Indictment charging the defendant with (1) unlicensed firearms dealing, in violation of 18 U.S.C. § 922(a)(1)(A) and 2; and (2) interstate transfer of a firearm to an out-of-state resident, in violation of 18 U.S.C § 922(a)(5) and 2. On May 2, 2024, the defendant was arrested in the Eastern District of Tennessee, presented there, and released on bail. The defendant appeared for arraignment before this Court on May 28, 2024. On September 30, 2024, a grand jury sitting in this District returned a four-count Superseding Indictment charging the defendant and Diaz with: (1) conspiracy to traffic in firearms in violation of 18 U.S.C § 922(a)(1)(A), in violation of 18 U.S.C. § 371; (2) unlicensed firearms dealing, in violation of 18 U.S.C. § 922(a)(1)(A) and 2; (3) interstate transfer

of a firearm to an out-of-state resident, in violation of 18 U.S.C § 922(a)(5) and 2; and (4) interstate transportation and receipt of firearms, in violation of 18 U.S.C. § 922(a)(3) and 2.[2]

On January 30, 2025, the defendant pleaded guilty to Count One of the Indictment. In the Plea Agreement, the parties stipulated that under the applicable Guidelines Manual (effective November 1, 2021), the defendant's offense level was 27 because (i) the offense involved a firearm that is described in Title 26, U.S.C. § 5845(a) (base level 18); (ii) the offense involved between eight and twenty-four firearms (four-level increase); (iii) the defendant engaged in the trafficking of firearms (four-level increase); and (iv) the defendant possessed and transferred a firearm in connection with another felony offense, or with knowledge, intent or reason to believe that it would be used or possessed in connection with another felony offense (four-level increase). After a three-level decrease for the defendant's acceptance of responsibility, the final calculated offense level was 27. The Plea Agreement contemplated a criminal history category I, and a Guidelines range of 70 to 87 months' imprisonment. However, because a violation of 18 U.S.C. § 371 carries a statutory maximum sentence of 60 months' imprisonment, the stipulated Guidelines sentence was 60 months, below the applicable Guidelines range.

The parties and the United States Probation Office ("Probation") agree, except as to one respect, on the applicable Guidelines calculation. As reflected in the Plea Agreement, as well as the initial PSR *see* Dkt. 68, the parties and Probation initially determined that one of the firearms recovered in connection with the conspiracy, *i.e.*, a Dickinson Arms Tac-4 12-gauge shotgun bearing the serial number 2191101382, qualified as a firearm under the definitions set forth in 26 U.S.C. § 5845(a), which in turn is subject to additional enhancements under the Sentencing Guidelines. However, after the defendant's change of plea hearing, and after consulting further with agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives and the NYPD, the Government alerted Probation that the recovered shotgun does not appear to meet the definition set forth in Title 26, U.S.C. § 5845(a).

As a result, Probation calculated a base offense level of 12, rather than 18, resulting in a total offense level of 21 and a criminal history category of I, for a Guidelines range of 37 to 46 months' imprisonment.[3] Probation recommends a sentence of 25 months' imprisonment, with a term of 2 years' supervised release.[4]

---

[2] Tyson is the sole defendant named in Count Three of the Superseding Indictment; Diaz is the sole defendant named in Count Four of the Superseding Indictment.

[3] The Government does not object to Probation's Guidelines calculation, including the inapplicability of the additional six-point increase in the base offense level currently reflected in the Plea Agreement. Nevertheless, as set forth above, the parties stipulated to the applicability of that enhancement, and the Government stands by the Plea Agreement.

[4] To the extent that supervised release is imposed, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024)

### III.    A Guidelines Sentence of Imprisonment is Necessary and Appropriate

The Government respectfully submits that the statutory sentencing factors set forth in Title 18, United States Code, Section 3553(a) weigh in favor of a sentence of at least 37 months' imprisonment. The factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to afford adequate deterrence to this defendant and others, to protect the public from further crimes of the defendant, and to promote respect for the law. 18 U.S.C. § 3553(a)(2)(A)-(C).

The defendant's conduct in this case was serious and dangerous. The defendant's decision to buy and transport firearms that were eventually distributed throughout the Bronx directly endangered everyday New Yorkers. Two of the firearms that the defendant brought from Tennessee to New York already were used in shootings in this District. Only five of the 17 firearms the defendant trafficked have been recovered to date, meaning that additional harms may yet result from the defendant's conduct. And, as evidenced by the fact that two of the guns *already* were used in shootings in this District, those harms are more than theoretical. Having injected over a dozen firearms into the community, the defendant's conduct will continue to endanger lives for years to come.

The defendant's detailed, myriad communications with Diaz demonstrate that he had no qualms about supplying these firearms and was under no illusions that they would be used here in New York. PSR ¶ 14 (the defendant's text to Diaz's comment that he was "naked out there" was "already knowin . . . shit be wild, im get sum to the area soon.").[5] His indifference, even support, for how these firearms would be used is extraordinarily serious conduct and highlights the need for specific deterrence in this case.  Moreover, and beyond this particular defendant, there is also a need to send a message of general deterrence, specifically to make concrete the consequences for selling dangerous firearms into New York City. Without people like the defendant, who supply firearms from different jurisdictions, it would be much more difficult to obtain a firearm in New York City. Put differently, the defendant, and others like him, should be deterred in order to stem the flow of firearms to New York City, especially of the volume and dangerous type the defendant supplied.

This is particularly so at a time when gun violence in the Bronx reached post-pandemic highs, the defendant's conduct provided fuel for this fire.[6] Individuals like the defendant who

---

(same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).

[5] The defendant and Diaz used coded language to discuss firearms, including using words like "feet" and "shoes" for guns. This employment of coded language demonstrates the defendant's knowledge that his conduct was wrong.

[6] John Hall, *The Bronx's Crime Crisis*; Vital City, Jan. 23, 2025; *available at* https://www.vitalcitynyc.org/articles/the-bronxs-crime-crisis (last visited July 2, 2025) ("The Bronx was the only New York City borough in which shooting numbers increased this year. . . the Bronx recorded 324 shooting incidents—a 6.0% increase from the previous year and a stark 53.7% jump from 2019. The human impact is even more severe when examining the number of victims:

illegally traffic in firearms are the driving force behind an epidemic of gun violence in New York City. These individuals act with a complete disregard for the danger they create and the lives they put at risk. There are no gun manufacturers in New York City. A combination of a general lack of access to guns and strict local gun laws creates a black market that allows gun traffickers like the defendants to sell guns to make quick money. The defendant exploited that black market and endangered those around him. In effect, the defendant callously jeopardized the lives of New Yorkers to make money from selling firearms.

The Government recognizes that the defendant has no criminal history and is a young man who endured a difficult childhood. Indeed, the Government has already recognized those countervailing factors through the Plea Agreement, which permitted the defendant to plead to Count One, which carries a statutory maximum sentence of 60 months' imprisonment, significantly limiting his sentencing exposure based on the expected Guidelines range at the time of the plea. While Probation has calculated the defendant's Guidelines range at 37 to 46 months' imprisonment, the Government continues to believe that a significant sentence is warranted given the defendant's conduct.

That the nature and seriousness of the offense, and the need for general and specific deterrence, should be the primary considerations driving the sentence here is underscored by the prevalence and dangerousness of gun violence in New York City, which is made possible by people like the defendant supplying weapons. At a time when gun violence remains prevalent, the need for general deterrence is particularly striking. *See United States v. Cavera*, 550 F.3d 180 (2d. Cir. 2008) (considering the district court's decision to consider New York market conditions in order to accomplish the goal of general deterrence in a gun trafficking case and holding no abuse of discretion). Straw purchasers like the defendant are critically important to efforts, as here, to supply firearms in New York City. A serious sanction is therefore warranted for the § 3553(a) factors set forth above.

## IV.    Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a significant custodial sentence of at least 37 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:    *Rita Maxwell*
_____
Georgia V. Kostopoulos
Rita Maxwell

---

414 people were shot, representing a 10.4% increase from last year and a 64.3% surge from 2019's total of 252 victims.").

Assistant United States Attorneys
(212) 637-2467 / 2206

cc:    Michael Arthus, Esq.
        Thomas F. Dunn, Esq.